VALENTINE v. VALENTINE et al.

(Circuit Court, N. D. California. July 27, 1891.)

MINING LANDS—RESERVATIONS IN RAILROAD GRANTS—EVIDENCE.

Act Cong. July 1, 1862, granting lands to aid in the construction of the Central Pacific Railroad, contained a proviso excepting all mineral land from the operation thereof. In an action of ejectment it appeared that the land in question was within the grant, and that in certain ravines thereon mining had been carried on from 1850 to 1867, and that residents in the vicinity considered it mineral land; that the map of definite location of the road had not been filed until November, 1866, and that prior to that time two quartz lodes had been located on the land; that plaintiff had bought the land of the company, and when her agent was negotiating for it he was informed by the company that the land was reserved as mineral land, and that its *status* as such would probably be sustained. The defendants claimed under laws of the United States relating to mineral lands. *Held* that, upon the facts stated in the opinion, the defendants were entitled to judgment. Following *Francoeur* v. *Newhouse*, 43 Fed. Rep. 236.

At Law. Action of ejectment by Marie A. Valentine against S. D. Valentine and others.

*Joseph D. Redding* and *B. E. Valentine*, for plaintiff.

*C. H. Lindley* and *Henry Eickhoff*, for defendants.

HAWLEY, J. This is an action of ejectment. The case was tried before the court without a jury. The plaintiff claims title to the S. E. ¼ of section 33, of township 15 N., of range 9 E., M. D. M. She alleges in her complaint that defendants have wrongfully and unlawfully ousted and ejected her from a portion of said land, to-wit:

"Two shafts, sunk for mining purposes, and the under-ground workings connected therewith, called by them the 'Big Oak Tree Mine;' together with the surface ground occupied by hoisting works, and two smaller buildings, all situated upon the portion of said section designated upon the segregation surveys of said township as lot No. 37 and lot No. 3, * * * to which premises the defendants pretend to assert a claim under the laws of the United States relating to mineral land."

Plaintiff's title to the quarter section was acquired from the Central Pacific Railroad Company. The title of the railroad company is dependent for its validity upon the construction to be given to the act of congress of July 1, 1862, granting lands "to aid in the construction of a railroad * * * from the Missouri river to the Pacific ocean," (12 St. U. S. 489,) and to proofs as to the character of the land, whether mineral or non-mineral. The land is in an odd-numbered section within the terms of said grant, and the title thereto passed from the government to the railroad corporation, unless the land is "mineral land" within the meaning of those words as contained in the proviso of section 3 of said act of congress, which reads as follows: "Provided, that all mineral lands shall be excepted from the operation of this act." Judge SAWYER, in *Francoeur* v. *Newhouse*, upon demurrer to complaint, held that this exception of mineral lands from the grant only extended to lands known to be mineral, or apparently mineral, at the time when the grant attached; that the discovery of a gold mine in the lands after

the title had vested by full performance of the conditions did not defeat the title. 40 Fed. Rep. 618. When that case was tried he instructed the jury "that the words 'mineral land,' as used in the act of congress, mean land known to be mineral at the time the grant took effect, and attached to the specific land in question, or which there was satisfactory reason to believe were such at said time; and only such land as was known to be mineral, or which there was satisfactory reason to believe was mineral at the time the grant attached to the land, is excepted from the grant." 43 Fed. Rep. 238. Entertaining these views, the learned judge instructed the jury to find special issues, among others, as follows:

"(1) Was the land in question known to be mineral, or was there good reason to believe it was mineral, at the date of filing the map of general location of the route of the road, and the withdrawal of the lands by order of the secretary of the interior, on August 2, 1862? (2) Was the land in question known to be mineral, or was there good reason to believe that it was mineral, at the time that the line of the road was definitely located in 1866? (3) Is the land in question in fact mineral land?"

The jury found these issues in the affirmative, and rendered a general verdict for the defendant. The facts in the case were to some extent different from the facts in this case, but the legal questions presented in each are identical.

It is, among other things, shown by the testimony upon the part of plaintiff that the plats of the surveyor general's office, and the return of the deputy-surveyor, that township 15 N., range 9 E., was, on the 26th of December, 1865, returned as agricultural land; that the land in the quarter section involved in this case is covered with a deep red soil that is rich and fertile, and well adapted for agricultural purposes; that in 1851 one Egbert, who, in connection with his mercantile business at Illinoistown, in the vicinity of this land, had a large pack train, fenced in quite an extensive tract of land, including a large portion of this particular quarter section, cultivated portions of it in a small way, raised a crop of hay, and pastured his mules on the balance of the land, and in this way maintained his possessory title until 1864, when he sold and disposed of his interest therein; that the land during all these years was reasonably good grazing land, and is now valuable for fruit-raising and vineyard culture.

Upon the part of the defendants, several witnesses, who had known the land ever since 1850, and had frequently visited the ground in dispute at various times up to 1867, testified in substance to the effect that from 1850 to 1867 mining had been conducted more or less upon and along the bed and banks of Bear river, which runs along near one of the lines of section 33; that the miners, in the summer seasons, worked along the river, and in the winter or rainy seasons, when water could be obtained, mining was carried on in the ravines that led into the river, including Coombs' ravine and Kingston ravine, portions of which ravines are on the quarter section in controversy; and mining thereon was conducted within 200 or 300 yards of the ground where the Rising Sun,

Milford, and Big Oak Tree quartz mines are located; that there was an old Spanish arastra in Kingston ravine, where quartz rock had been worked long prior to 1862; that most of the mining done in those years was what is known among miners as "gravel" or "surface" mining, accompanied at times with more or less success, and often with failure and disappointment, in the search for gold; that as high as 250 men were thus engaged along Bear river, and a less number in the ravines; that float quartz containing gold was found in the ravines, and more or less prospecting done for quartz ledges; that the quartz lode known as the "Rising Sun," which in after years proved to be of great value, cropped out on the surface of the ground, and could readily be seen. All of these witnesses testified that from 1850 to 1867 the land in controversy was considered by the people then living in that vicinity or frequently visiting the locality as mineral land. Their testimony in this respect is not disputed. It also appears from the testimony that the map of the definite location of the railroad was not filed in the department at Washington until November 3, 1866; that prior to that time two quartz lodes had been taken up and located on this quarter section, viz., the "Rising Sun," located March 5, 1866, and the "Milford," April 6, 1866; that the agent of plaintiff, when negotiating for the purchase of this land from the railroad, was informed by the land-agent of the railroad corporation that the quarter section had been reserved as mineral land; and that, while the question as to its mineral or non-mineral character had not been judicially determined, there were facts connected with the land which led him to believe that its *status* as mineral land would be sustained.

It is proper to add that I have carefully considered the various objections made to the foregoing testimony and the arguments of the respective counsel as to its weight, relevancy, and bearing, touching the issues of fact presented in this case. To refer to all the testimony in detail would require a recital of the early history of mining in California. It is enough, in this case, to say that I have briefly referred to such facts as are deemed to be the most important, material, and relevant, and sufficient to enable the court to arrive at a correct conclusion. From all the testimony given upon the trial I find the facts to be (1) that at the date of the filing the map of the general location of the route of the Central Pacific Railroad Company, on the 2d of August, 1862, there was good reason to believe that the land in controversy was mineral land at that time; (2) that on the 3d of November, 1866, when the line of the railroad was definitely located, there was good reason to believe that the land was mineral, and that it was known to be mineral land at that time; (3) that the land is in fact mineral land, and was known by the plaintiff to be claimed as mineral land at the time she obtained a deed therefor from the railroad company on the 1st day of December, 1887. Upon these facts the conclusion of law necessarily follows that the defendants are entitled to judgment herein for their costs. Let judgment be entered accordingly.